1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JON BURNIGHT,

11           Petitioner,              No. CIV S-08-1894 MCE CHS P

12      vs.

13   D.K.SISTO,

14           Respondent.          FINDINGS AND RECOMMENDATIONS

15   _____/

16                      I.  INTRODUCTION

17          Petitioner Burnight is a state prisoner proceeding pro se with a petition for a writ

18   of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a January 23, 2007

19   decision of the state parole authority that he was not suitable for parole.

20                      II.  BACKGROUND

21          In the early morning hours of June 30, 1989, petitioner armed himself with a

22   double-barreled, sawed off shotgun and walked to the home of his friend, the victim, Steve

23   Zeehandelaar, to confront him regarding information the victim had relayed to petitioner's

24   girlfriend about petitioner's infidelities.  Petitioner stashed the shotgun in some bushes near the

25   victim's home and proceeded to the front door.  An argument ensued, at which time petitioner

26   retrieved the shotgun and fired one round into the victim's throat at point blank range.  Petitioner

1

tossed the weapon into the bushes and ran to his girlfriend's house.  From there he drove to the Santa Rita County Jail and turned himself in to police.

Petitioner declined to discuss the details of his offense at the 2007 parole suitability hearing.  In previous versions given, petitioner has stated that he took the shotgun to the victim's home with the intent to scare the victim.  After he retrieved the shotgun from the bushes, the victim came forward to grab the gun, and, in surprise, petitioner fired a round into the victim's neck.[1]

Petitioner pleaded guilty to second degree murder and was sentenced to a term of 15 years to life in state prison.  His minimum eligible parole date passed on April 23, 1999.

On January 23, 2007, a panel of the Board of Parole Hearings ("Board") conducted a fourth subsequent (fifth overall) parole suitability hearing to determine whether petitioner was suitable to be released on parole.  It was determined that petitioner still posed an unreasonable risk of danger to the public, and thus that he was not suitable for parole.

Petitioner challenged the Board's denial of parole in a petition for writ of habeas corpus to the Alameda County Superior Court; his claims were denied in a written decision filed on August 13, 2007.  The California Court of Appeal and the California Supreme Court likewise denied petitioner's requested relief, but without written opinions.

### III.  GROUNDS FOR RELIEF

The pending federal petition presents the following grounds for relief, verbatim:

GROUND ONE- The BPH's decision to deny petitioner parole violated petitioner's right to due process of law under the California and United States Constitutions.  The Board failed to afford petitioner an individualized consideration of all the factors relev[a]nt to parole decisions.

GROUND TWO- The BPH violated petitioner's due process of law under California and United States Constitutions by using

---

[1] In a letter petitioner wrote while at the Santa Rita jail, petitioner characterized the shooting as an "accident" that never should have happened, but has since made clear, for many years now, that he no longer views his offense as an accident.

2

language that gave extra weight to the gravity of petitioner's commitment offense.  Petitioner was not afforded individualized consideration of all relevant factors to parole decisions.

GROUND THREE- The BPH using a religious based program to in part deny petitioner suitability violates the 1st Amendment of the United States Constitution's Establishment Clause and the 14th Amendment civil liberties.

Petitioner's first and second grounds for relief both challenge the Board's denial of parole as a violation of due process, and accordingly, will be addressed together herein as a single claim.  For purposes of this opinion, however, ground three will be addressed first.

IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)). Additionally, this petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001). This court looks to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United

1   States Supreme Court or whether an unreasonable application of such law has occurred. *Avila v.*

2   *Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919 (2003).

3                   V.  DISCUSSION

4       A.     First Amendment (Ground Three)

5       Petitioner claims that the Board's denial of parole violated his rights under the

6   Establishment Clause of the First Amendment because it was based, in part, on his failure to

7   attend Alcoholics Anonymous, a faith-based program.

8       "It is beyond dispute that, at a minimum, the Constitution guarantees that

9   government may not coerce anyone to support or participate in religion, or its exercise..." *Lee v.*

10   *Weisman*, 505 U.S. 577, 587 (1992).  The United States Supreme Court has articulated three

11   basic tests for identifying Establishment Clause violations. *Lemon v. Kurtzman*, the 403 U.S.

12   602, 613 (1971).  Under these tests, government acts must (1) have a "secular legislative

13   purpose"; (2) not have a "principal or primary effect" which either "advances [or] inhibits

14   religion"; (3) and not foster "an excessive government entanglement" with religion. *Id*.  A

15   government mandate to attend religious or religion-based events, for example, is clearly barred.

16   *Inouye v. Kemna*, 504 F.3d 705, 713 n.7 (9th Cir. 2007).

17       In *Inouye v. Kemna*, the Ninth Circuit adopted a three part mode of inquiry for

18   determining whether there has been governmental coercion of religious activity.  504 F.3d at 713.

19   The *Inouye* "coercion test" asks, sequentially: (1) has the state acted; (2) does the state action

20   amount to coercion; and (3) is the object of the coercion religious rather than secular?  *Id*.

21   (applying "coercion test" to parolee's §1983 action challenging a requirement that he attend a

22   faith-based treatment program as a condition for remaining on parole); *see also Turner v.*

23   *Hickman*, 342 F.Supp.2d 887, 894-95 (E.D. Cal. 2004) (applying "coercion test" to §1983 action

24   alleging inmates were required to participate in a faith-based treatment program as a condition

25   for release on parole).

26   /////

1       In the parole suitability context, the first element of the *Inouye* coercion test is

2   satisfied if the parole board expressly states that the prisoner must participate in the faith-based

3   program. *Turner*, 342 F.Supp.2d at 895-96.  The second element is met if the Board advises the

4   prisoner he will not be eligible for parole unless he participates in the faith-based program. *Id*. at

5   896.  Programs such as AA and NA are "fundamentally religious" within the meaning of the

6   third element of the coercion test. *Id*. at 896-97.

7       On state habeas corpus review of petitioner's First Amendment claim, the

8   Alameda County Superior Court held:

9       As to Petitioner's claim that the Board used his lack of
        participation in religious based program to deny parole in violation
10      of his 1st and 14th Amendments, that contention is without merit.
        Because of Petitioner's alcohol and drug addiction, the Board was
11      concerned with Petitioner's lack of participation in substance abuse
        programs and there is no indication in the record that the Board
12      required the programs be religious.

13  (*In re Burnight*, No. H12927, Order Denying Petition, August 13, 2007, at 2-6.)

14      Petitioner contends that AA, NA, and other faith based programs are the only self-

15  help substance abuse programs available to him.  Even assuming the truth of this allegation, it

16  remains that nothing in the Board's decision required his participation.  Although the panel of the

17  Board presiding over petitioner's 2007 suitability hearing discussed the sufficiency of his

18  participation in substance abuse programming, the panel did not indicate that petitioner was

19  required to participate in AA, NA, or any faith based substance abuse program in order to be

20  found suitable.  Moreover, although petitioner's practice of the Wicca religion was briefly

21  discussed at the 2007 parole suitability hearing, it is noted that petitioner never expressed to the

22  Board, nor did the record indicate, that his religious beliefs conflicted with participation in the

23  substance abuse programs offered at his institution.  In fact, as will be discussed in connection

24  with the due process claim, petitioner participated in many such programs during his

25  incarceration without any indication of such a conflict.  At the time the 2007 parole suitability

26  hearing, for example, it was noted that he was attending AA.  Nothing in the record suggests that

his attendance was coerced.  *Cf. Turner*, 342 F.Supp.2d at 891-92 (*Inouye* "coercion test" for proving a First Amendment violation satisfied where panel member advised prisoner that his participation in NA was a "mandatory" prerequisite to the Board's parole suitability determination).

In sum, the state court's rejection of petitioner's First Amendment claim is not an unreasonable application of clearly established Supreme Court precedent, nor based on an unreasonable determination of the facts in light of the evidence.

B.      Due Process (Grounds One and Two)

As an initial matter, to the extent petitioner's first and second grounds for relief are based on alleged violations of state law, including the due process clause of the California Constitution, federal habeas corpus relief is unavailable.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("[a] federal court may not issue the writ on the basis fo a perceived error of state law").

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits state action that deprives a person of life, liberty, or property without due process of law.  A person alleging a due process violation must first demonstrate that he or she was deprived of a protected liberty or property interest, and then show that the procedures attendant upon the deprivation were not constitutionally sufficient.  *Kentucky Dep't. of Corrections v. Thompson*, 490 U.S. 454, 459-60 (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

A protected liberty interest may arise from either the Due Process Clause itself or from state laws.  *Board of Pardons v. Allen*, 482 U.S. 369, 373 (1987).  The United States Constitution does not, in and of itself, create for prisoners a protected liberty interest in receipt of a parole date.  *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981).  If a state's statutory parole scheme uses mandatory language, however, it creates a presumption that parole will be granted, thereby giving rise to a constitutional liberty interest.  *McQuillion*, 306 F.3d at 901 (citing *Greenholtz v.*

*Inmates of Nebraska Penal*, 442 U.S. 1, 12 (1979)).  California's statutory scheme for determining parole for life-sentenced prisoners provides, generally, that parole *shall* be granted "unless consideration of the public safety requires a more lengthy period of incarceration."  Cal. Penal Code §3041 (emphasis added).  This statute gives California state prisoners whose sentences carry the possibility of parole a clearly established, constitutionally protected liberty interest in receipt of a parole release date.  *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (*citing Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903; *Allen*, 482 U.S. at 377-78 (*quoting Greenholtz*, 442 U.S. at 12)).

The full panoply of rights afforded a defendant in a criminal proceeding is not constitutionally mandated in the context of a parole proceeding.  *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987).  The Supreme Court has held that a parole board's procedures are constitutionally adequate if the inmate is given an opportunity to be heard and a decision informing him of the reasons he did not qualify for parole.  *Greenholtz*, 442 U.S. at 16.

Additionally, as a matter of California state law, denial of parole to state inmates must be supported by at least "some evidence" demonstrating future dangerousness.  *Hayward v. Marshall*, 603 F.3d 546, 562-63 (9th Cir. 2010) (en banc) (citing *In re Rosenkrantz*, 29 Cal.4th 616 (2002), *In re Lawrence*, 44 Cal.4th 1181 (2008), and *In re Shaputis*, 44 Cal.4th 1241 (2008)).  California's "some evidence" requirement is a component of the liberty interest created by the state's parole system."  *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir. 2010).  The federal Due Process Clause requires that California comply with its own "some evidence" requirement.  *Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir. 2010) (per curiam).  Accordingly, the United States Court of Appeals for the Ninth Circuit has held that a reviewing court such as this one must "decide whether the California judicial decision approving the... decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'"  *Hayward*, 603 F.3d at

562-63 9 (citing 28 U.S.C. §2254(d)).  This analysis is framed by the state's own statutes and regulations governing parole suitability determinations for its prisoners.  *See Irons*, 505 F.3d at 851.

Title 15, Section 2402 of the California Code of Regulations sets forth various factors to be considered by the Board in its parole suitability findings for murderers.  The Board is directed to consider all relevant, reliable information available regarding

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

15 Cal. Code Regs. §2402(b).  The regulation also sets forth specific circumstances which tend to show unsuitability or suitability for parole:

> (c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:
>
> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner....
>
> (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
>
> (3) Unstable social history.  The prisoner has a history of unstable or tumultuous relationships with others.
> (4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
>
> (5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.
>
> (6) Institutional Behavior. The prisoner has engaged in

serious misconduct in prison or jail.

(d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

15 Cal. Code Regs. § 2402(c)-(d).

The overriding concern is public safety and the proper focus is on the inmate's *current* dangerousness. *In re Lawrence*, 44 Cal. 4th at 1205. Thus, the applicable standard of

1  review is not whether some evidence supports the reasons cited for denying parole, but whether

2  some evidence indicates that the inmate's release would unreasonably endanger public safety.  *In*

3  *re Shaputis*, 44 Cal.4th at 1254.  In other words, there must be a rational nexus between the facts

4  relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety.

5  *In re Lawrence*, 44 Cal. 4th at 1227.

6          At petitioner's 2007 parole suitability hearing, various factors and circumstances

7  relevant to his suitability for parole were reviewed and discussed.  Petitioner reported to the

8  panel that he had a reasonably stable childhood but also that there was "some dysfunction"

9  involved, including alcoholism in the family.  His parents divorced when he was four; there were

10  "large gaps" in his relationship with his father.  At age 10, petitioner witnessed his mother being

11  pistol whipped by her second husband, who reportedly then shot at petitioner, but missed.

12  Petitioner's older brother died in a car accident when petitioner was 14.  Petitioner reports that he

13  began experimenting with drugs at age 15.  Petitioner was expelled from high school for truancy,

14  but earned his GED prior to incarceration.

15          The commitment offense, occurring at age 18, is petitioner's only adult

16  conviction, although a representative from the Alameda County District Attorney's Office

17  present at the hearing noted that he was on "juvenile probation" at the time of the offense.

18  Notably, petitioner has never received a single "CDC 115" disciplinary report during his entire

19  incarceration, nor even one of the less serious "128" custodial counseling citations which are

20  issued for minor misconduct.  *See In re Gray*, 151 Cal.App.4th 379, 389 (2nd Dist. 2007) ("[A]

21  CDC 115 documents misconduct believed to be a violation of law which is not minor in nature.

22  A form 128 documents incidents of minor misconduct").

23          While incarcerated, petitioner completed two vocations: welding and aircraft

24  mechanics.  He took correspondence college courses earning 48 units.  At the time of the 2007

25  parole suitability hearing, he was working and assigned to Metal Fabrication.  Petitioner has

26  attended and participated in various institutional programs.  It was noted that, during the two

1  years immediately preceding the 2007 parole suitability hearing, he completed an intensive 90

2  hour, three week Offender Employment Continuum workshop, a Creative Conflict Resolution

3  Workshop, Anger Management, Stress Management, Breaking Barriers, the second phase of a

4  faith-based 12 step recovery program, and various FEMA certification programs including

5  Radiological Emergency Response, Decision-Making and Problem-Solving, and Livestock and

6  Disaster, among others.

7           Petitioner's most recent psychological report, prepared in December 2006, was

8  supportive of release.  The psychological professional who evaluated petitioner wrote that

9  petitioner "showed remorse, took responsibility for his actions, and participated in educational

10  and vocational programs."  The evaluator noted that petitioner "attended AA and Straight Life

11  Program and had taken numerous self-help group courses."  Under "Assessment of

12  Dangerousness/ Recommendations," the evaluator concluded:

13           Mr. Burnight has upgraded himself educationally and vocationally,
            and seems to have marketable skills and motivation for work.  He
14           has participated in a number of self-help groups in an ongoing
            quest for self-improvement.  He has a sparse criminal background
15           outside of the instant offense.  He appears to have an outside
            support system and his release plans appear realistic, upon
16           verification, particularly with regard to the location of parole.
            Drugs and alcohol were an inherent part of his lifestyle and
17           mindset at the time of the crime and continued abstinence is an
            important factor.  Tragically, his only sibling died when they were
18           both young, but Mr. Burnight appears to find a support system in
            his parents.  He has an exemplary disciplinary history.  He
19           acknowledges his actions in the crime and the effect that has
            reverberated from that.  Overall, he is considered to represent an
20           average risk of dangerousness upon release compared to the
            general [free] population (that is, a low risk) provided he abstain
21           from alcohol and drug usage.

22  (Psychosocial Evaluation for the Board of Parole Hearings, Charles Taylor, Ph.D., undated, at 6-

23  7.)[2]

24  /////

25  _____

26      [2] Dr. Taylor's report is undated, but indicates that it is based in part on information
     gathered from interviews with petitioner on November 29, 2006 and December 21, 2006.

11

1    Petitioner is a certified aircraft mechanic and a certified welder.  If paroled, he

2   planned to work as a welder.  He produced evidence of a solid job offer welding truck frames for

3   a trucking company.  Petitioner had letters of support from his mother, father, stepsister, and

4   others.  His mother offered financial and other support.  Although she had previously made

5   petitioner an offer of residence in her home in Hayward, CA, petitioner's residence plan had

6   changed because he could not live within 35 miles of the victim's family, also in Hayward.

7   Petitioner's father and stepmother offered their support, including an offer of future residence in

8   Henderson, Nevada.  In the meantime, if found suitable and released to parole in California,

9   petitioner's family planned to help him find and finance an apartment near his place of

10  employment.

11   Considering these factors, the panel noted the decision was "difficult," but

12  ultimately concluded that petitioner would pose an unreasonable risk of danger to society or a

13  threat to public safety if released from prison, and thus that he was not yet suitable for parole.

14  The panel explained the decision as follows:

15           This offense was carried out in an especially cruel and callous
             manner.  The victim, Steve Zeehandelaar, a 17-year-old male, was
16           particularly vulnerable in that he was your friend, he was unarmed,
             [and] it was very early in the morning... when he opened his front
17           door to you.  This offense was carried out in a dispassionate
             manner.  Approximately a month earlier, you had sawed off your
18           grandfather's shotgun barrel.  That night walking to the victim's
             home, you placed the shotgun in the bushes near the front of the
19           residence.  After an argument with the victim at the doorway of his
             home regarding the information the victim had related to [your]
20           girlfriend, you retrieved the shotgun, returned to the front door and
             shot one round directly into the victim's throat.  Approaching the
21           front door, the victim's brother saw you standing over the victim
             and then you ran to [your] girlfriend's house, told her what had
22           happened, drove to Santa Rita, crashing into a post outside the
             office at the Sheriff's Department and told the deputies that you
23           had just shot someone.

24           You have, by record and by your own testimony, suffered a
             dysfunctional family.  And we have gone into that in some detail
25           on the record.  Also, you've been very candid about alcohol and
             drug abuse, particularly from the years '85 until the commitment
26           offense.  You have been under, were under formal supervision for

12

driving suspended, but you didn't have an extensive prior criminal history.

And you have programmed commendably, exceptionally, I would say, in prison, in that first of all, and perhaps foremost, you have no 115s. We don't very often see that. And that includes no 128(a)s. So, that goes a long way toward walking the walk and telling us that you actually do understand how to behave at least within a prison setting, which clearly you needed at the time of commitment. You had, on the outside, obtained your GED. And you did serve four prior years in the Santa Rita Jail. You're currently in Metal Fabrication. You have two vocations. First, as the licensed welder, Vocational Welding, which you achieved in 2002, and perhaps one of the most marketable skills, you're currently a... licensed air-frame and power plant mechanic...

(RT at 72-74). After a discussion clarifying that petitioner had taken courses in but not actually completed the Office Services vocation, the decision continued:

And as has been read into the record, you have a number of laudatory chronos from both 2005 and 2006. Those were read into the record today. You also have completed many self-help and therapy courses, noting Stress Management, Creative Conflict Resolution, Anger Management, Breaking Barriers, Crimanon, several substance abuse and 12-Step Recovery Program courses, the FEMA certifications, the Greystone Chapel faith-based recover[y] program and you do have a current certificate for involvement in AA. We should make a comment on that, I believe as well.

...And we talked about the AA involvement a little bit during the hearing... and the fact that the most recent chrono you provided me was the third quarter of '06 and the most recent one prior to that that I could find in the C-File was June of '02. And you had indicated that you had been participating in other substance abuse programs and that that was filling up the space. But in looking over the list of all of the therapy and self-help programs that you've been in, obviously, a very substantial list, there's really only one. The 12-Step Program and that was back in December of '04. Even if some of the other programs that you participated in may have to one degree or another dealt with substance abuse problems, the length of those courses all put together wouldn't in any way at all fill in the time period between June of 2000 and third quarter of '06 and that raised concerns with us.

...

As to the psychological report dated November 29th, 2006, the most recent by Dr. Charles Taylor, he does assess you as a low risk of violence, as have several others prior to him and that has been

13

1
2
3
4
5
6
7
8
9

> read into the record.  As to your parole plans.  You have stated that
> you would honor the 35-mile stay away order with respect to the
> victim's family.  And you have made provision, your parents,
> actually, are supporting, making provision for you being able to
> rent.  A very point is [sic] that you might want to decide where it is
> you would actually like to rent, although we recognize that you
> would have to finalize that upon release.  You also, and this is
> you're to be commended for, setting up and being concerned about
> a sponsor for a recovery and diversion program on the outside.
> That's very important.  You also have a job offer with the Best
> Equipment Company in Concord.  And that's not a requirement.
> The only requirement by law is that you have marketable skills and
> you certainly do have marketable skills in the mechanics license
> you hold and the welding experience and licensure that you have,
> as to the several courses in Office Services and related technology,
> obviously.  Those would serve you well also.

10   (Subsequent Parole Consideration Hearing, State of California, Board of Parole Hearings,

11   January 23, 2007 ("Hearing Transcript") at 76-78.)

12         The panel additionally noted that a representative from the District Attorney's

13   Office had appeared to oppose to petitioner's parole, but did not appear to rely on such

14   opposition as evidence to support the parole decision.  Indeed, law enforcement's opposition to

15   parole may be properly considered (*see* Cal. Pen. Code, § 3046(c)), but does not constitute

16   evidence of unsuitability.  *See In re Dannenberg*, 173 Cal.App.4th 237, 256 n.5 ("The District

17   Attorney's 'opinion' ... is not evidence, and therefore does not constitute 'some evidence'

18   supporting the [parole] decision.").

19         As to petitioner's due process claim, the Alameda County Superior Court held in

20   the last reasoned state court opinion on state habeas corpus review that the Board properly gave

21   individualized consideration to all relevant factors, and that "some evidence" supported it's

22   decision.  The state court explained:

23
24
25
26

> The record reveals that the Board gave individualized
> consideration to all relevant factors.  The Board's decision goes
> into detail as to many favorable circumstances in support of parole,
> and is not required to specify in detail every pertinent fact relied
> upon.  Despite the positive factors, the Board felt that these did not
> outweigh the factors tending to show unsuitability for release on
> parole.  The Board found petitioner unsuitable for parole primarily

14

based on the commitment offense. Despite the claim by Petitioner, there is no indication that the Board found Petitioner unsuitable for parole based on a previous record of violence. It appears that Petitioner misconstrues the Board's discussion of Petitioner's prior criminal history, as a finding of a previous record for violence. In fact, in its decision, the Board specifically stated that Petitioner did not have an extensive criminal history.

When denial of parole is based solely on the commitment offense such denial justifies especially close scrutiny, and denial based solely on this factor is permissible so long as the Board does not fail to consider all relevant factors. The Board can look at the circumstances of the offense and rely on the crime alone, so long as it points to factors beyond the minimum elements of the crime, in determining that a prisoner is suitable for release. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1070-1071 (*Dannenberg*); *Rosenkrantz*, *supra*, 29 Cal.4th 616.) As the *Dannenberg* Court noted, "[t]he regulations do set detailed standards and criteria for determining whether a murderer with an indeterminate life sentence is suitable for parole. Among the specified circumstances of the commitment offense that "tend to indicate suitability for release" are that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." *Dannenberg*, *supra*, 34 Cal.4th at p. 1080.)

In finding that petitioner would pose an unreasonable risk of danger if released on parole, the Board specifically stated that the offense was carried out in a dispassionate manner. In this case, the record shows that [petitioner] shot the victim at close range by putting the sawed off shot gun to the victim's throat and then shooting one round. There is some evidence of dispassion in the way this murder was carried out.

Our Supreme Court has stated that "sole reliance on the commitment offense might, in particular cases, violate section 3041, subdivision (a)'s provision that a parole date "shall normally be set" under "uniform term" principles, and might thus also contravene the inmate's constitutionally protected expectation of parole. We explained that such a violation could occur, "for example[,] where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." (*Dannenberg*, *supra*, 34 Cal.4th at p. 1095). The Board also relied on factors beyond the minimum elements of the crime.

"[A]ll second degree murders by definition involve some callousness-- i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and sufferings of others." (*Smith*, *supra*, 114 Cal.App.4th at p. 366.) Therefore, all second degree murders will involve some amount of viciousness of callousness. Second degree murder is defined as the unlawful

killing of a human being with malice aforethought, *but without the additional elements* of willfullness, premeditation, and deliberation that would support a conviction of first degree murder. "Willful" means intentional, deliberate means deciding to act after thoughtful consideration, and premeditated means the act was considered beforehand. Premeditation and deliberation do not require much time and may be arrived at quickly. Here, Petitioner armed himself with a sawed off shotgun, and went over to his friend's home in the early morning hours. He placed the sawed off shotgun in the bushes before confronting his friend. After some argument, Petitioner retrieved the weapon and shot his friend at close range. There is evidence of premeditation as discussed by the Board in its decision. Thus, the circumstances of the crime went beyond the minimal necessary for the conviction of second degree murder.

The Board also noted that Petitioner had been very candid about his drug and alcohol abuse and the Board expressed some concern about the lack of substantial participation in substance abuse programs from 2000 to 2006. This appeared to play into the Board's decision to deny parole. In contrast to the life prisoner in *In re DeLuna* (2005) 126 Cal.App.4th 585 (*DeLuna*), there is some evidence by Petitioner's own admission that Petitioner had an alcohol and drug problem, and that it contributed to a history of unstable and tumultuous relationships, which included cheating on his girlfriends. More importantly, there is evidence that drugs or alcohol currently pose a problem for Petitioner, or currently makes him [sic] unsuitable for parole. Petitioner himself admits that drugs and alcohol are a problem. Moreover, Dr. Taylor who interviewed Petitioner twice before writing Petitioner's psychological evaluation stated: "Drugs and alcohol were an inherent part of his lifestyle and mindset at the time of the crime and continued abstinence is an important factor." Dr. Taylor considered Petitioner "to present an average risk of dangerousness upon release compared to the general population (that is a low risk) provided he abstain from alcohol and drug usage."

Importantly, Petitioner did not object or correct the Board when it discussed Petitioner's participation in substance abuse programs as follows: "the fact that the most recent chrono you provided me was the third quarter of '06 [participation in AA] and the most recent one prior to that that I could find in the C-File was June of '02. And you had indicated that you have been participating in other substance abuse programs and that was filling up the space. But in looking over the list of all the therapy and self-help programs that you've been in, obviously a very substantial list, there's really only one. The 12-Step Program and that was back in December of '04. Even if some of the other programs that you participated in may have to one degree or another dealt with substance abuse problems, the length of those courses all put together wouldn't in any way at all fill in the time period between June of 2000 and third quarter of '06..." A review of the record provided by Petitioner, including the

16

1    evaluation reports for the parole hearings support the Board's
2    observations regarding Petitioner's participation in substance abuse
     programs.

3    ...

4    The Board's determination that Petitioner poses an unreasonable
     risk of danger to society because his offense was committed in an
5    especially callous manner relied upon facts beyond the minimum
     elements of second degree murder, took into consideration all
6    relevant and reliable factors, and is supported by some evidence.
     Thus, the Board's denial of release on parole does not violate due
7    process.

8    (*In re Burnight*, No. H12927, at 2-6 (some citations omitted).)

9           In finding that some evidence supported the Board's decision that petitioner was

10   unsuitable for parole, the state court recognized the Board's reliance primarily on the nature and

11   circumstances of the commitment offense, but also on inadequate substance abuse programming

12   or "gaps" in substance abuse programming during incarceration.  The remaining factors

13   identified or discussed during the panel's reading of the decision indeed appeared to either weigh

14   in favor of, or be neutral toward, a finding of parole suitability.

15          As explained in the last reasoned state court decision, in *Rosenkrantz* (29 Cal.4th

16   at 682), the California Supreme Court held that a prisoner's commitment offense can under some

17   circumstances by itself constitute a valid basis for denying parole.  Since the *Rosenkrantz*

18   decision, however, the California Supreme Court has clarified that in order for the circumstances

19   of a commitment offense to suffice to support the denial of parole, there must be "something in

20   the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state,"

21   that indicates "the implications regarding the prisoner's dangerousness that derive from his or her

22   commission of the commitment offense *remain probative* to the statutory determination" of the

23   prisoner's current or future dangerousness.  *See Cooke*, 606 F.3d at 1216 (quoting *In re*

24   *Lawrence*, 44 Cal. 4th 3d at 1214) (emphasis added).  In *Lawrence* (44 Cal.4th 3d 1181) and

25   subsequent decisions, the California Supreme Court has appeared to move away from its

26   previous decisions in *Dannenberg* (34 Cal.4th 1061) and *Rosenkrantz* (29 Cal.4th 616) to the

17

1   extent those decisions had been read to permit the Board to deny parole solely because the

2   commitment offense was "particularly egregious."  The California Supreme Court explained, "it

3   is not the circumstance that the crime is particularly egregious that makes a prisoner unsuitable

4   for parole- it is the implication concerning future dangerousness that derives from the prisoner

5   having committed that crime." *In re Lawrence*, 44 Cal.4th at 1207.

6          In other words, California law authorizes the Board to consider the circumstances

7   of the commitment offense, but only insofar as those circumstances relate to the inmate's current

8   dangerousness. *In re Lawrence*, 44 Cal.4th at 1214.  "In some cases, such as those in which the

9   inmate has failed to make efforts toward rehabilitation, has continued to engage in criminal

10  conduct postincarceration, or has shown a lack of insight or remorse, the aggravated

11  circumstances of the commitment offense may well continue to provide 'some evidence' of

12  current dangerousness even decades after commission of the offense." *Id*. at 1228.

13         The applicable state regulations specify that factors relating to a commitment

14  offense tend to show unsuitability for parole where (A) multiple victims were attacked, injured or

15  killed; (B) the offense was carried out in a dispassionate and calculated manner, such as an

16  execution-style murder; (C) the victim was abused, defiled or mutilated; (D) the offense was

17  carried out in a manner which demonstrates an exceptionally callous disregard for human

18  suffering; or (E) the motive for the crime is inexplicable or very trivial in relation to the offense."

19  15 Cal. Code Regs. §2402 (c)(1)(A)-(E).

20         In this case, the Board appeared to find at least one of the above factors supported

21  in the record, while the state court took note of two factors.  To begin, both the Board and the

22  state court described the manner in which petitioner committed his offense as "dispassionate."

23  There is some evidence that petitioner carried out his offense in a dispassionate and calculated

24  manner, in that he went to the home of his friend in the middle of the night with a concealed

25  weapon which he hid in a bush and later retrieved to shoot the friend in the throat at point blank

26  range.

18

1          Further, as fairly characterized by the state court, petitioner's motive for the

2   murder was trivial.  Of course, all motives for murder could reasonably be deemed trivial; the

3   relevance of this suitability factor is that one whose motive is unusually trivial or cannot be

4   explained may be unusually unpredictable and dangerous.  *See In re Scott*, 119 Cal.App.4th 871,

5   893 (1st Dist. 2004) (*Scott I*).  Here, petitioner's motive stemmed from his anger toward the

6   victim for the victim having told petitioner's girlfriend about his infidelities.  Such a motive

7   could fairly be characterized as unusually trivial, particularly where the victim was petitioner's

8   good friend.

9          The question remains, however, whether the aggravated circumstances of

10  petitioner's offense, including his trivial motive and the dispassionate manner in which he

11  committed the offense, remain probative to a determination of his current or future

12  dangerousness in light of other facts in the record demonstrating significant rehabilitation and

13  changes in his psychological and mental attitude.  *See In re Lawrence*, 44 Cal.4th at 1221.  In two

14  previous cases pending in this district in which petitioner challenged previous denials of parole,

15  the undersigned found that the aggravated circumstances of petitioner's offense continued to be

16  probative in light of the record as it existed then, and recommended that those petitions be

17  denied.  *See Burnight v. Carey*, 2:05-cv-02019-MCE-CHS (regarding a June 14, 2002 parole

18  decision); *Burnight v. Carey*, 2:06-cv-02398-MCE-CHS (regarding a September 15, 2004 parole

19  decision).[3]  Both reports were adopted.  The first judgment was not appealed, but the second is

20  currently pending before the Ninth Circuit.

21         As discussed in those previous reports, the Ninth Circuit has recognized and

22  cautioned that, while a denial of parole based solely on the circumstances of the commitment

23  offense can initially satisfy due process requirements, continued reliance over time on such

24

25         [3] In those two cases, other factors not present here, including but not limited to the length
26  of time served, demonstrated a sufficient nexus between petitioner's aggravated offense and the
    Board's finding of unsuitability.

1   unchanging factors may result in a due process violation.  *Biggs,* 334 F.3d at 916; *see also Irons,*
2   505 F.3d at 853.  In the instant case, upon careful review of the current record and applicable
3   law, it appears that the Board's continued reliance on petitioner's commitment offense at the
4   2007 suitability hearing has violated his right to due process of law.  Although the callous murder
5   that petitioner committed meets the regulatory description for one that is especially aggravated,
6   its circumstances are not so heinous, atrocious or cruel that, standing alone, those circumstances
7   continued to demonstrate that he was too dangerous to be released approximately 18 years later,
8   in light of other evidence in the record demonstrating significant rehabilitation.  Thus, on the
9   record that was before the Board in 2007 and is currently before this court, a determination that
10  petitioner was unsuitable for parole based solely on the facts of his commitment offense was not
11  supported by some evidence in the record.  The Board and state court cited one additional factor,
12  however, in support of its decision to deny parole.

13          Aside from the nature and gravity of petitioner's commitment offense, the Board
14  appeared to rely on the fact that there was a "gap" in petitioner's AA participation from
15  sometime in 2002 until approximately the third quarter of 2006.  It is undisputed, however, that
16  petitioner participated in other substance abuse prevention programs during that period of time.
17  For the reasons that follow, the Board's finding in this regard does not suffice to support the
18  2007 denial of parole.

19          In a report prepared in 2002 specifically for the Board of Parole Hearings, it was
20  noted that "Burnight has continuously been involved in Alcoholics Anonymous during his
21  incarceration.  He has held the position as Co-chairman of steps 1 thru 6 of AA study group."
22  Similarly, in petitioner's 2006 psychological report, it was noted that he "has participated in AA
23  for many years."  At the 2007 suitability hearing, however, the panel found there was a "gap" in
24  petitioner's AA participation from 2002 until the third quarter of 2006.  During the review
25  portion of the hearing, the panel discussed this gap with petitioner and appeared to accept his
26  explanation that it was either for or because of his participation in other substance abuse

20

1   programs during that time period.  But then, during the reading of the decision, the panel found

2   without any additional explanation that those other programs were not an adequate substitution

3   because "the length of those courses all put together" did not "fill in the time period."  This

4   "raised concerns" with the panel.

5           Petitioner contends, with support in the record, that the following other substance

6   abuse related certificates and chronos from the relevant period of time *were* present in his file:

7           1.  Criminion, Understanding/Handling Addiction Course, 3/9/06

8           2.  Phase Two 12 Step Recovery Program- 12/6/04

9           3.  Phase One 12 Step Recovery Program- 12/22/03.

10  Notwithstanding the Board's finding that these alternate programs did not "fill in the time

11  period" for petitioner's gap in AA participation, the record does not contain some evidence that

12  petitioner was unsuitable for parole in 2007 because of inadequate substance abuse

13  programming, a gap in AA specifically, or a current substance abuse problem.

14          At the 2007 parole suitability hearing, the panel discussed with petitioner his

15  participation in AA:

16          [Commissioner]:        Now, you've participated in Alcoholics
                                    Anonymous.
17
            [Petitioner]:          Yes....
18
            [Commissioner]:        And there's a laudatory, I'm sorry.  Go
19                                  ahead.

20          [Petitioner]:          Currently.

21          [Commissioner]:        And there's a laudatory chrono that's dated
                                    for the third quarter 2006.  And that's not in
22                                  the C-File.

23          [Petitioner]:          Okay.

24          [Commissioner]:        But we realize that it sometimes takes a long
                                    period of time for documents to get in the C-
25                                  File.

26          [Petitioner]:          Yeah.

| | [Commissioner]: | But I also didn't see any other chronos regarding AA attendance since June of 2002. |
| | [Petitioner]: | Since 2002? |
| | [Commissioner]: | Yeah. |
| | [Petitioner]: | Can I look at this real quick? |
| | [Commissioner]: | Please, yeah. |
| | [Petitioner]: | The latest chrono that I have since the last one of the third quarter for 2006, the one prior to that is December 6th, 2004, which is the, I took time away from Alcoholics Anonymous to do this course, this intensive course, this 12-Step Recovery Program at Old Folsom. |
| | [Commissioner]: | Okay. |
| | [Petitioner]: | Prior to that, I took a Substance Abuse class at Old Folsom in September 24th of '04. And prior to that, I took the other 12-Step Recovery Program at Old Folsom Prison, April 12th, 2004.  Prior to that, successfully completed another 12-Step Recovery Program, December 22nd of 2003. |
| | [Commissioner]: | That covers – So, during your participation in AA, there were some breaks in that participation– |
| | [Petitioner]: | Only to – |
| | [Commissioner]: | –only for participating in other programs? |
| | [Petitioner]: | Yes.  Other substance abuse programs. |

(Hearing Transcript at 25-27.)  Petitioner's history of substance abuse was also discussed as

follows:

| | [Commissioner]: | Do you consider yourself an alcoholic? |
| | [Petitioner]: | Yes. |
| | [Commissioner]: | And how about narcotics?  Do you consider yourself a drug addict? |

22

| | | |
|---|---|---|
| 1 | [Petitioner]: | I did drugs, yes.  And as far as I know, for the rest of my life, I'll be both.  I'm |
| 2 | | recovering. |
| 3 | [Commissioner]: | What's your clean-and-sober date? |
| 4 | [Petitioner]: | Incarceration. |

(Hearing Transcript at 19.)  Later, the discussion continued:

| | | |
|---|---|---|
| 6 | [Commissioner]: | If you're granted a parole date and return to the community, have you made plans or |
| 7 | | done any exploration into programs in the community, such as AA that would assist– |
| 8 | [Petitioner]: | I have (inaudible). |
| 9 | [Commissioner]: | –[t]hat would assist you in staying alcohol |
| 10 | | and substance abuse free? |
| 11 | [Petitioner]: | Yes.  I have made accommodations.  I have a letter from my mom's lifetime friend, |
| 12 | | Reese Jones, he basically set me up with this woman, Rita Morales, and she was |
| 13 | | previously part of Xanthos and that's a drug, alcohol and anger management abuse |
| 14 | | program.  And she's willing to give me any help that I need to fulfill the needs of my |
| 15 | | parole.  Would you like to see the letter? |
| 16 | [Commissioner]: | Yes, Officer, could we have that?  Thank you. |
| 17 | | |
| 18 | [...] | |
| 19 | [Commissioner]: | Sir, you've been through a number of 12-Step programs and you appear to be candid |
| 20 | | about your polysubstance abuse.  How would you go about making amends to the |
| 21 | | people you've harmed? |
| 22 | [Petitioner]: | As part of AA and other substance abuse programs, I don't want to sound blase about |
| 23 | | it, but as part of the Steps, Step Eight is to make a list and become willing to make |
| 24 | | amends to all these people.  I've done that. Step Nine, actually, that's where you make |
| 25 | | amends whenever possible, except when to do so would injure them or others. [¶]  To |
| 26 | | make amends, that's not only to say you're sorry.  That's to create a change in your life. |

1
2
3
4
5
6
7
8
9
10

> That is to actually prove to the person that
> you have harmed that you have made
> changes, that you have become a recovering
> alcoholic and you're truly sorry as well. To
> make amends to all of the people that I've
> came in contact during the approximate four
> years I've been doing drugs and alcohol
> [sic], I would say it's almost impossible,
> because I'm not in contact with these people.
> [¶] I've apologized to my own family. I've
> done great harm to my own family, as well
> as the victim's family. I can only apologize
> in here and hopefully prove to myself, at
> least to the victim's family that I am deeply
> sorry for what I've done and I do make
> amends. I have changed my life
> considerably to fit the needs of mainstream
> society and going back into the community.

11  (Hearing Transcript at 32-33.) When asked how he had changed, petitioner responded:

12
13
14
15
16
17

> Basically, while I was out on the streets, my life was consumed
> with drugs and alcohol and reckless living. I was a very impulsive
> person. I was a teenager. I believe my mentality was mentally, I
> was, it was stunted because of the life I was leading. I had no
> direction. Even though I got my GED and I made several attempts
> to straighten out my life, I always chose to hang out with the wrong
> friends and choose the wrong lifestyle. [¶] Now, today, some 18
> years later, I'm more mature through age, through the wisdom of
> the programs that I have taken. I've taken great steps to understand
> why I have this addiction and what caused me to use drugs and
> alcohol.

18  (Hearing Transcript at 36-37.) And finally, asked which of the 12 steps he had completed,

19  petitioner indicated that he had worked on each of the 12 steps, but that "Step 10 is a

20  continuation of the program. It never ends." (Hearing Transcript at 48.)

21         Thus, despite noting that petitioner had "been through a number of 12-Step

22  programs," the panel remained "concern[ed]" with the gap in AA participation specifically. The

23  panel's concern in this regard will not suffice to demonstrate that petitioner was unsuitable for

24  parole. There was ample evidence of petitioner's participation in various substance abuse

25  programs over many years. It is undisputed that petitioner attended other substance abuse

26  programs during the gap in his AA participation. It is also undisputed that petitioner resumed

participation in AA after completion of those other programs.  He was attending AA at the time

of the 2007 suitability hearing.  Petitioner indicated that he would continue participating in a

substance abuse program in the free community if paroled, and provided documentation of his

efforts at locating such a program.  The individual who would act as petitioner's sponsor in the

program he chose submitted a letter to the Board on his behalf.

It is true that the psychological evaluator conditioned petitioner's low risk of

future violence on his continued abstention from alcohol and drug usage.  Since petitioner is a

recovering alcoholic and addict, the use of drugs and alcohol will likely always be his biggest

risk factor.  Nevertheless, "a prisoner's *prior* addiction is not an appropriate consideration in

determining parole suitability."  *See In re Smith*, 109 Cal.App.4th 489, 505 (2nd Dist. 2003)

(emphasis added) (noting also that no evidence in the record demonstrated the inmate was

*presently* addicted to drugs).  Thus, without something more in the record to show that

petitioner's history of substance abuse remains probative to a determination of his current

dangerousness, it is not evidence of current unsuitability.  "What *does* constitute evidence is

[petitioner's] abstention from alcohol throughout the... years prior to his parole hearing, as well

as his impeccable disciplinary record in prison, both of which are highly probative of his attitude

towards alcohol and his capacity for self-discipline."  *Pirtle v. Cal. Bd. Of Prison Terms*, 611

F.3d 1015, 1024 at n.7 (9th Cir. 2010) (emphasis in original) (holding also that "[b]ecause there

is no evidence that [petitioner] will be unable or unwilling to manage his alcohol problem

effectively upon release, as he has already done for more than two decades, we agree with the

district court that "the record does not support the panel's determination that petitioner's

[previous] abuse of alcohol... rendered him dangerous [at the time of the hearing]."  *Pirtle*, 611

F.3d at 1024.

In a similar case in which the governor had reversed a finding of parole suitability

in part because of a perceived need for further drug treatment, the California Court of Appeal

held:

1    There is no evidence that Smith denies he had a drug problem or
2    denied he had a problem for some period of his incarceration.
     There is no evidence that he refused, failed, or did poorly in drug
     treatment programs.  And there is no evidence that Smith has ever
3    used any type of illicit substance during his incarceration.  Nor
     does the record support a reasonable belief that without further
4    drug treatment *in prison*, Smith might start taking drugs again.

5    *In re Smith*, 114 Cal.App. 4th 343, 368 (6th Dist. 2003) (emphasis in original).

6            The reasoning employed by the Board and state court in this case similarly implies

7    that there are grounds to believe petitioner would start using drugs again if released.  The record

8    contains no evidence to support such a finding.  The ultimate question of petitioner's potential

9    threat to public safety "must be supported by some evidence, not merely by a hunch or intuition."

10   *In re Lawrence*, 44 Cal.4th at 1213.  Petitioner discussed at length the work he was doing in the

11   area of substance abuse prevention and his remarks did not appear to be disingenuous.  On this

12   record, the state court's determination that "drugs or alcohol currently pose a problem for

13   petitioner," was an unreasonable determination of the facts in light of the evidence, as was its

14   determination that the record supported the panel's observations that a "gap" in his AA

15   attendance demonstrated his unsuitability for parole at the time of the 2007 hearing.  In this case,

16   the Board's decision to deny parole based solely on circumstances relating to petitioner's

17   commitment offense and a perceived "gap" in AA attendance has violated his right to due

18   process of law.

19                   C.       Appropriate Remedy

20           Having determined that a due process violation occurred, a remedy must be

21   fashioned.  Initially, it is noted that federal habeas courts have "broad discretion in conditioning a

22   judgment granting habeas relief" and in disposing of habeas corpus matters as law and justice

23   require.  *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987); *see also Burnett v. Lampert*, 432 F.3d

24   996, 999 (9th Cir. 2005) (stating that federal courts "have a fair amount of flexibility in

25   fashioning specific habeas relief").

26   /////

1    Petitioner contends that the only appropriate relief in this case is immediate

2  release on parole.  In the recent *Pirtle* case, the Ninth Circuit reaffirmed that "the district court's

3  remedy of ordering the Board to set a parole date within thirty days was proper."  611 F.3d at

4  1025.  In so holding, the Ninth Circuit observed:

5         The State argues that the district court's remedy was improper, and
          that the appropriate remedy would be to remand the case to the
6         Board with instructions to hold another hearing.  There is no merit
          to this argument.  Federal courts have the latitude to resolve a
7         habeas corpus petition "as law and justice require."  28 U.S.C.
          §2243.  Ordering the release of a prisoner is well within the range
8         of remedies available to federal habeas courts.  "Habeas lies to
          enforce the right of personal liberty; when that right is denied and a
9         person confined, the federal court has the power to release him."

10  *Id*. at 1025 (quoting *Fay v. Noia*, 372 U.S. 391, 430-31 (1963)), *overruled on other grounds by*

11  *Wainwright v. Sykes*, 433 U.S. 72 (1977)).

12    Even more recently, however, the California Supreme Court held that the

13  appropriate remedy, in state court at least, is not immediate release, but rather, a new parole

14  hearing comporting with due process.  *In re Prather*, 50 Cal.4th 238, 305-06 (2010).  In *Prather*,

15  the California Supreme Court disapproved of (1) an appellate court order that purported to

16  confine subsequent consideration by the Board to new evidence of the inmate's conduct in

17  prison, as well as (2) an order that dispensed entirely with any further evaluation by the Board.

18  *Id*. at 255.  The *Prather* decision was based on Article III, section 3 of the California Constitution

19  and the state's separation of powers doctrine.  *Id*. at 256-57 ("A reviewing court may not-

20  consistent with the principles embodied in the separation-of-powers doctrine- impair the exercise

21  of [the Board's] discretion by placing improper limits upon the Board's review of a prisoner's

22  record.").  The state appellate court orders reviewed in *Prather* thus constituted "intrusions by

23  the judiciary into the executive branch's realm of parole matters."  *Id*. at 254.

24    In *Haggard v. Curry*, No. 10-16819, (9th Cir. October 12, 2010) (order granting

25  stay) (per curiam), a panel of the Ninth Circuit stayed an order of the United States District Court

26  for the Northern District of California which had ordered the immediate release of a successful

27

1  habeas corpus petitioner.  In the published stay order, the *Haggard* court reasoned that a stay of

2  release was warranted, because even if the petitioner were successful, he would not be entitled to

3  immediate release.  Citing the California *Prather* case, the *Haggard* court indicated that a new

4  hearing comporting with due process would be the only relief available.  The *Haggard* court

5  interpreted *Prather* as having "ma[de] clear that the state-created liberty interest... does not

6  encompass actual relief."  *Haggard*, No. 10-16819, order granting stay at 5.

7         Indeed, a court sitting in federal habeas corpus may not grant a remedy that

8  exceeds the bounds of a state-created liberty interest, as that interest is actually defined and

9  limited by the state.  *See Bergen v. Spaulding*, 881 F.2d 719, 721 (9th Cir. 1981); *see also*

10  *Greenholtz*, 442 U.S. at 12.  In accordance with this new Ninth Circuit authority, it is

11  recommended that respondent be ordered, within 60 days, to calculate a release date for

12  petitioner as if he had been found suitable for parole following the January 23, 2007 suitability

13  hearing, and to release him in accordance with that date, unless the Board elects to hold a new

14  suitability hearing that comports with due process of law and is consistent with this court's

15  findings and conclusions regarding the evidence in the existing record.

16                           VI.  CONCLUSION

17         For the foregoing reasons, IT IS HEREBY RECOMMENDED that the application

18  for writ of habeas corpus be GRANTED to the extent set forth above.

19         These findings and recommendations are submitted to the United States District

20  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-

21  one days after being served with these findings and recommendations, any party may file written

22  objections with the court and serve a copy on all parties.  Such a document should be captioned

23  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

24  shall be served and filed within seven days after service of the objections.  Failure to file

25  objections within the specified time may waive the right to appeal the District Court's order.

26  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

28

1   1991).

2   DATED: November 15, 2010

3

4                            CHARLENE H. SORRENTINO
5                            UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26